AO 91 (Rev. 08/09)   Criminal Complaint



**FILED**

# UNITED STATES DISTRICT COURT
for the
Western District of Texas

FEB 2 7 2014

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____ DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| HECTOR HERNANDEZ (1) | ) |
| JOHNNY ROMO (2) | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

Case No.  5:14-MJ-214

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   October 2011 thru February 2014   in the county of   BEXAR   in the

WESTERN   District of   TEXAS, and elsewhere  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21/846, 841(a)(1), 843(B) | Did knowingly and intentionally conspire to import  and possess with intent to distribute Marijuana and more than 5 kilograms of Cocaine,  and  to utilize a communication facility while facilitating the commission of these acts.<br><br>PENALTIES: 10 - life imprisonment; $10,000,000 fine; at least 5 years of supervised release; and $100 mandatory special assessment. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

CHAD J. LLOYD, SPECIAL AGENT
*Printed name and title*

Sworn to before me and signed in my presence.

Date:        02/27/2014

_____
*Judge's signature*

City and state:          SAN ANTONIO, TX

HENRY J. BEMPORD, US MAGISTRATE JUDGE
*Printed name and title*

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against    -

HECTOR HERNANDEZ,
and JOHNNY ROMO

AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(21 U.S.C. §§ 841 (a)(1), 21 U.S.C. 843 (B) and 21 U.S.C. 846)

- - - - - - - - - - - - - - - - - - - X

I, Chad J. Lloyd, being duly sworn, deposes and says that I am a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that in or about and between October of 2011 and February 2014, both dates being approximate and inclusive, within the Western District of Texas and elsewhere, that **HECTOR HERNANDEZ** and **JOHNNY ROMO**, together with others, did knowingly and intentionally conspire to import and possess with intent to distribute a substance containing marijuana, a Schedule I controlled substance, and knowingly and intentionally utilized a communication facility while facilitating the commission of these acts, in violation of Sections 841(a)(1), 843 (B) and 846 of Title 21 of the United States Code.

(Title 21, United States Code, Sections 846, 843, 841(a)(1), Title 18, United States Code, Sections 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:

I.    **Qualifications and Sources of Information**

A.      I have been a Special Agent with the DEA for approximately fourteen (14) years.   Through my work with the DEA, I have participated in numerous narcotics investigations, during the course of which I have conducted or participated in surveillance, execution of search warrants, debriefings of informants, reviews of taped conversations and narcotics records, and Title III investigations.   Through my training, education and experience, I have become familiar with the manner in which narcotics are trafficked and the efforts of persons involved in such activity to avoid detection by law enforcement, including the use of coded language by those individuals in an effort to disguise the subject matter of their conversations.

B.      The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, members of the DEA and other law enforcement agencies, and from review of various documents obtained by subpoenas.   In the portions of this affidavit that describe intercepted wire communications, virtually all of the information, unless otherwise indicated, is based upon my review of draft line sheets created by the monitoring DEA agents who intercepted the telephone call.[1]   Furthermore, in the paragraphs below that describe surveillance within the United States, all surveillance was conducted by Agents and officers assigned to the San Antonio Office of the DEA, including myself, and agents of the Federal Bureau of Investigation as well as Investigators with the Texas Department of Public Safety.   The observations of the other involved law enforcement agents have been related to me to supplement the activities that I personally observed.

C.      In this Affidavit, I have described portions of certain telephone

---

[1]   The participants in the intercepted calls relied on in this affidavit spoke primarily in Spanish. For purposes of preparing this affidavit, your deponent relied upon English translations of the line sheets prepared by DEA translators.

conversations that were intercepted during the course of court-authorized wire surveillance.    I have not, however, summarized every pertinent intercepted call, nor have I included every pertinent part of the call that I have summarized.    Moreover, any transcripts of intercepted calls are preliminary and in draft form.    As such, the summaries set forth in this affidavit are preliminary in nature.    My opinions concerning the meaning of coded or veiled conversations are based on my training and expertise developed as a result of investigating the distribution of controlled substances.

D.    Unless otherwise indicated, identifications of individuals on the wire intercepted communications in this investigation were made through name and voice identifications of the defendants made by the law enforcement agents monitoring the wire interceptions.    Agents initially identified each interceptee through the interceptee's identification of himself or herself by name during the course of the conversation in conjunction with available subscriber information.    Thereafter, agents would identify the interceptee through either the use of their name or voice identification based upon comparisons with prior interceptions of that individual.

E.    As set forth in the paragraphs below, there is probable cause to believe that the defendants are involved in the trafficking of narcotics, including marijuana.    Because I submit this affidavit for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth all facts known to me about this investigation and case.

## II.    Background

F.    In May of 2012, the DEA and FBI San Antonio, Texas Offices (SADO) initiated an investigation into the drug trafficking activities of San Antonio based cocaine &

4

marijuana traffickers and their associates.   This investigation has developed into a multi-jurisdictional Organized Crime Drug Enforcement Task Force (OCDETF) investigation incorporating numerous Federal, State and Local agencies.   Your affiant believes that the law enforcement seizures, significant events, recorded conversations, toll analysis and intercepted dialed digit (pen register) information and intercepted calls, set forth below demonstrate that **Hector HERNANDEZ** and **Johnny ROMO**, were both involved in the distribution of controlled substances, and on several occasions, utilized a communication facility (particularly a cellular telephone), to further conduct their drug trafficking activity, and they conspired to do so with others within this investigation.

G.     In 2012, this investigation was initiated based on interviews of a reliable Confidential Source (CS#1), who stated that Joe C. GARCIA was involved in the distribution of marijuana, cocaine, and other narcotics within the San Antonio, Texas area.   During these interviews, CS #1 stated that Joe C. GARCIA distributed and transported narcotics within vehicles that GARCIA and several of his associates drive within the San Antonio, Texas area.   CS #1 gave numerous statements regarding the narcotic trafficking activities of GARCIA, which were independently corroborated through other statements and information provided by confidential sources, cooperating defendants, and other law enforcement resources, and surveillance.   During one of these statements, CS #1 identified GARCIA as utilizing his cellular telephone to conduct drug trafficking activity.   At the direction and monitoring of Agents, CS #1 placed several drug-related telephone calls and electronic communications to GARCIA.

H.     As a result, on June 21, 2012, a court order authorizing the interception of wire and electronic communications on GARCIA's cellular telephones was signed by United

States District Judge Fred Biery of the Western District of Texas.   The wire interceptions on one of GARCIA's cellular telephones began on June 22, 2012.   From this time until the end of the interceptions on August 22, 2012, the DEA intercepted numerous drug-related calls between GARCIA and members of his organization, including **Hector HERNANDEZ** and **Johnny ROMO**.   On the intercepted calls, GARCIA is heard coordinating drug payments to **HERNANDEZ** and **ROMO** for prior drug transactions, as well as negotiating future drug transactions.   The content of these previously intercepted telephone calls are explicit in which **Hector HERNANDEZ** and **Johnny ROMO** both consistently instruct GARCIA to pay back a drug debt for a previous drug transaction.   Furthermore, during several calls, **Johnny ROMO** went into detail with GARCIA describing the extent of the criminal activities he was involved in, to include the illegal facilitation of automatic firearms, as well as stolen vehicles, and illegal narcotics, all summarized as organized criminal activity.   These intercepted calls are discussed in greater detail later in the current affidavit.

I.       On January 28, 2013, an individual was arrested by DEA in a separate investigation for possession with intent to distribute approximately five kilograms of cocaine. The individual became a cooperating defendant, and provided a statement confirming that **ROMO** orchestrated the attempted transaction in which **ROMO** requested that the cooperating defendant arrange to procure five (5) kilograms of cocaine for one of **ROMO**'s drug-related associates.   The cooperating defendant stated that **ROMO** negotiated the price per kilogram with the cooperating defendant, and that **ROMO** would contact the cooperating defendant via cellular telephone prior to and leading up to the attempted transaction.   On the day of the seizure and arrests, Agents reviewed the text messages of the defendants which revealed contact between **ROMO** and one of

6

the defendants regarding the upcoming transaction.   Furthermore, Agents reviewed toll records

the revealed telephonic contact between **ROMO** and the arrested defendants prior to and leading

up to the transaction, corroborating the statements made regarding **ROMO**'s role within the

attempted drug transaction.

J.   On July 17, 2013, as a result of the electronic and wire intercepts on the

GARCIA Telephone, another drug-related associate was arrested for providing a false statement

during the purchase of a firearm.   Subsequent to their   arrest, the individual cooperated and

provided a statement, and positively identified a photograph of **Johnny ROMO** as being the

individual who is a narcotic associate of GARCIA.   The cooperating defendant further stated that

on two occasions in 2012, he/she witnessed **ROMO** and GARCIA conduct drug-related

transactions in San Antonio, Texas.   This transaction involved **ROMO** receiving marijuana back

from GARCIA that was previously supplied to GARCIA by **ROMO** during an earlier time.

K.   In August of 2013, another reliable confidential source (CS #2) stated that

**Hector HERNANDEZ** distributed and transported narcotics in the San Antonio, Texas area.

The CS #2 gave numerous statements regarding the narcotic trafficking activities of

**HERNANDEZ**, which were independently corroborated through other statements and

information provided by confidential sources, cooperating defendants, and other law enforcement

resources, surveillance, as well as prior DEA investigations involving intercepted telephone

conversations of **HERNANDEZ**.

L.   During one of these statements, the CS #2 identified **HERNANDEZ** as

utilizing cellular telephone number 210-378-7758 (hereafter referred to as the **Prior**

**HERNANDEZ Telephone**).   CS #2 stated that for at least three years, the CS #2 is aware that

**HERNANDEZ** delivers and distributes approximately four to five pounds of crystal methamphetamine per week throughout the San Antonio area, and then collects narcotic proceeds from these same customers.   The CS #2 stated that **HERNANDEZ** receives direction to distribute the narcotics from **Johnny ROMO**, who is also a high-ranking member of the **BANDIDO OUTLAW MOTORCYCLE GANG** and sponsored **HERNANDEZ** as a prospect for the **BANDIDO OUTLAW MOTORCYCLE GANG**.

          M.      At the direction and monitoring of Agents, the CS# 2 placed several drug-related telephone calls and electronic communications to **HERNANDEZ prior cellular telephone**, as well as telephone number 210-439-5556 (**HERNANDEZ' current cellular telephone**).   On October 17, 2013, a court order authorizing the interception of wire and electronic Communications on **HERNANDEZ' current cellular telephone** was signed by United States District Judge Xavier Rodriguez within the Western District of Texas.   The wire and electronic interceptions were initiated on October 21, 2013.   From this time until the end of the interceptions on December 18, 2013, the DEA intercepted numerous drug-related calls between **HERNANDEZ** and members of his organization.   On the intercepted calls, **HERNANDEZ** is heard coordinating drug payments to his source of supply, as well as arranging for future deliveries of narcotics.   The content of these previously intercepted telephone calls are explicit in which **HERNANDEZ** and his source of supply discuss drug debts owed for previous drug transactions. Furthermore, during several calls, **HERNANDEZ** goes into detail with his associates describing the extent of the criminal activities he is involved in, to include assault, as well as trafficking stolen items, and illegal narcotics, all summarized as organized criminal activity.   These intercepted calls are discussed in greater detail later in the current affidavit.

N.    In February of 2014, a cooperating defendant provided a statement in which they positively identified the participants of telephone calls that were previously intercepted by DEA as **Hector HERNANDEZ** and **Johnny ROMO**.   Furthermore, the cooperating defendant stated that during the intercepted calls, **HERNANDEZ** was referencing a drug debt involving a previous drug transaction for over 50 kilograms of marijuana supplied to the cooperating defendant in San Antonio, Texas in May of 2012.   In addition, the cooperating defendant stated that during the intercepted calls, **ROMO** was referencing a large-scale drug debt involving at least five separate drug transactions involving at least 250 to 400 kilograms of marijuana that occurred between **ROMO** and the cooperating defendant in San Antonio, Texas between October of 2011 and June of 2012.   The cooperating defendant also positively identified photographic lineups of **HERNANDEZ** and **ROMO** as the individuals he/she completed drug transactions with during this time.   Furthermore, the cooperating defendant positively identified the code words utilized during the intercepted conversations of "green" as marijuana, "white" as cocaine, "fire", "fluff", and "popcorn" as marijuana, and "money" and "papers" as referring for cash owed on the outstanding drug debts. As mentioned previously, these calls are discussed in greater detail in the current affidavit.

Finally, the above-mentioned cooperating defendant stated that on several occasions between January of 2013 and January of 2014, **Hector HERNANDEZ** approached Joe C. GARCIA in regards to his recent arrest.   At that time, **HERNANDEZ** continued to question the cooperating defendant in regards to GARCIA's intentions regarding cooperating, in order to protect **Johnny ROMO's** involvement in the drug transaction from becoming known to law enforcement.

III.    **Court-Authorized Interceptions**

O.    As mentioned previously in the current affidavit, on June 21, 2012, a court order authorizing the interception of wire and electronic communications on GARCIA's cellular telephones was signed by United States District Judge Fred Biery of the Western District of Texas. The wire interceptions on one of GARCIA's cellular telephones began on June 22, 2012 and the electronic communications were initiated on a later date.   From this time until the end of the interceptions on August 22, 2012, the DEA intercepted numerous drug-related calls and electronic communications between GARCIA and members of his organization, including Hector **HERNANDEZ** and **ROMO**.   These calls are outlined below:

### 2012 Intercepted Calls with Hector HERNANDEZ

**Intercepted call #1**

On June 25th 2012, at approximately 9:00pm, **GARCIA** (utilizing the **GARCIA Telephone**), received an incoming call from **HERNANDEZ** on the **Prior HERNANDEZ Telephone**:

GARCIA:   "Did you get my text?"
HERNANDEZ: "Nah, I didn't get no text."
GARCIA:   "You didn't get it?"
HERNANDEZ: "Nah-uh"
GARCIA:   "Shit, I thought I send it to you hold on. . .,Nah, I went to Ol' boys house, dawg, and he said, he hasn't. . .his boy hasn't been to his house. . . He goes, I know I'll get that money, I said, What's up?, he goes, Nah, well this dude broke it down, that is the only way he could have done, you know?. . .For him to do it, cause that shit you know what I mean the middle is all ugly. . .and I was like damn, fool, show me something dawg. . .I text you right?. . .I text you from there but I don't know if you got it or not"
HERNANDEZ: "Nah, I did got no text"
GARCIA:   "Where are ya right now, at the crib?"
HERNANDEZ: "I just got here, I just got back from over there. . .they called me to go talk to them. . tell them what's going on. . ."

V

A short time later, the call was terminated.   During this call, the cooperating defendant confirmed that the caller was indeed **Hector HERNANDEZ**, and that the conversation involved a current drug debt over a prior narcotic transaction involving over one hundred (100) pounds of marijuana.   **GARCIA** tells **HERNANDEZ** that he sent an electronic communication to him of a story of how he went to his drug customer's house (referred to by code as "Ol' Boys house"), and that **GARCIA's** customer tells **GARCIA** that he will "get that money".   **GARCIA** goes on to say that "this dude broke it down" and that "the middle is all ugly", referring to the marijuana bricks that were opened were rotten in the middle.   Later during the call, **HERNANDEZ** tells **GARCIA** that he "just got back from over there", referring to just meeting **HERNANDEZ'** source of supply.

**Intercepted Electronic Communication Conversation #1**

On June 30th 2012, at approximately 2:15pm, **GARCIA** (utilizing the **GARCIA Telephone**), receives an incoming electronic communication from the **Prior HERNANDEZ Telephone**:

**HERNANDEZ:** "This is out of my hands already…these guys said u don't have it by Sunday night there going to ur shop to collect or take…i tried to keep them patient as much as I could bro…u cant say I didn't"
**GARCIA:**  "Say bro fk them, my boy is the one that's paying & if thy want to talk to him give me a number so he cld call them.   Same thing like u throwing them at me, I gave it to him & wat hapen, hapen…"

During this electronic communication, **HERNANDEZ** is telling **GARCIA** that he needs payment for a narcotic debt and that he will "collect or take" (code for forcefully collecting some type of payment).   **GARCIA** responds that "my boy" (code for **GARCIA'S** drug customer) has not paid him yet.   Furthermore, **GARCIA** continues to say that "like throwing them at me, I gave it to him & wat hapen, hapen".   Your Affiant believes that **GARCIA** is telling **HERNANDEZ** that like **HERNANDEZ** supplied the narcotics to **GARCIA**, **GARCIA** turned around and gave

11

the narcotics to his customer, and his customer had not paid him for the drug debt as of that time.

## Intercepted call #2

On July 9th 2012, at approximately 3:59pm, **HERNANDEZ** (utilizing the **Prior HERNANDEZ Telephone**), places an outgoing call to **GARCIA** on the **GARCIA Telephone**:

(Later during the call)
**HERNANDEZ**: "I mean, they're gonna ask dude". . ."don't get me wrong, they are fuckin talking a lot of shit over there, dude, I told them. . ."
**GARCIA**:  "Nah, I talked to my boy, dawg, he is like, look man, I'll fix it dawg, he goes, just give me by this week, which is next, which is this week. . ."
**HERNANDEZ**: "Yeah."
**GARCIA**:  . . ."If I had it I would fucking. . .you know?   Start giving out some payments, he goes, nah, look, he goes, let me. . .let me work this week, dawg, and he goes, I lost all my profits too bro, I lost money on top of that, and I said, Nah, I know, dawg, but I'm just saying, you know? If you give some payment or something like a G or Two G's or whatever, and then you know? Just, so these dudes that are waiting on me they won't be fucking be all pissed off. . ."

A short time later, the call was terminated.   During this call, **GARCIA** is telling **HERNANDEZ** that he contacted his drug customer, and that his customer told him that all of the drug profits were lost.   **GARCIA** continues to tell **HERNANDEZ** that he told his customer that he should pay one or two thousand dollars (referred to in the call as "a G or Two G's").

## Intercepted Electronic Communications Conversation #2
On July 13th 2012, at approximately 11:17pm, **HERNANDEZ** (utilizing the **Prior HERNANDEZ Telephone**), places an outgoing electronic communication to the **GARCIA Telephone**:

**HERNANDEZ:** "They said if he don't got the cash to give up some collateral. . .they want to square up already"

During this electronic communication, **HERNANDEZ** is telling **GARCIA** that if his drug customer does not have the drug payment, that **GARCIA** will need to give up some collateral as

payment.

**Intercepted Electronic Communication Conversation #3**
On July 20th 2012, at approximately 6:39pm, **HERNANDEZ** (utilizing the **Prior**

**HERNANDEZ Telephone**), places an outgoing electronic communication to the **GARCIA**

**Telephone**:

**HERNANDEZ:** "Need u to cover this already. . .can't wait on ur boy no more. . . ur not new to this. . .u know how it works bro. . .its been two months"
**GARCIA:** "Hey cuz my bad dog been fkn busy bro I talkd to oh cat & hes dwn at the L try to do sumthing already hes hittin me up this sknd see if he cld line sumthng up to give.   That's me talkn to him this morning. . ."
**HERNANDEZ:** "That's cool but if he doesn't we need to figure something out and u deal with him cause if not I have to cover out of my pocket and I aint doing that"

During this electronic communication, **HERNANDEZ** is telling **GARCIA** to pay the drug

debt and not wait for his customer to pay him.   **GARCIA** responds that his drug customer went

"down at the L" (code referring to Laredo, Texas, a Texas border town that drug traffickers

frequent in order to discuss and conduct drug transactions) to "try to do sumthing already".

**Intercepted call #3**
On July 23rd 2012, at approximately 9:02am, **GARCIA** (utilizing the **Garcia Telephone**),

places an outgoing call to **HERNANDEZ** on the **Prior HERNANDEZ Telephone**:

**GARCIA:**   "Hey, Save this number, dawg, Don't call me on the other one, the other one I don't. . ."
**HERNANDEZ:** "Okay"
**GARCIA:**   "What's it called, I'm going to call him right now. . .I'm over here at this office right quick, I'm a be in and out. . .I know he is over there in the Laredo, Let me see what's up, I know he is supposed to be coming back today"
**HERNANDEZ:**   "All right"
**GARCIA:**   "So, I'll call you, let me call him and see what he tells me"
**HERNANDEZ:**   "All right, bro"
**GARCIA:**   "All right, but save this number, this is the other one"

A short time later, the call was terminated.   During this call, I believe that **GARCIA** is

telling **HERNANDEZ** to not contact him on the **GARCIA Telephone #1**, but instead to call him

on another **GARCIA Telephone** (In Affiant's experience, drug traffickers often utilize more than one cellular telephone in order to conduct their drug trafficking activity). Furthermore, **GARCIA** tells **HERNANDEZ** that he is going to contact his drug customer and see if he has arrived back from Laredo to conduct a drug transaction.

**Intercepted call #4**

On July 25th 2012, at approximately 5:24pm, **GARCIA** (utilizing the **Garcia Telephone**), places an outgoing call to **HERNANDEZ** on the **Prior HERNANDEZ Telephone**:

**GARCIA**: "I talked to Ol' Boy, He is over there dawg. Did you get my text yesterday?"
**HERNANDEZ**: "Yeah, I got em. . .I looked at them last night"
(Later during the call)
**HERNANDEZ**: ". . .that got some bro, a lot dude, direct, direct fuckin line cuz, direct bro"
**GARCIA**: "But I mean, how is it dawg"
**HERNANDEZ**: "No man, it's Fire, bro, I'm talking about Fire, dude"
**GARCIA**: "Cause my boys ran out"
**HERNANDEZ**: "They want good bro, they want, I'm getting them to give them to me Three and a Half bro, But they want C-O-D, dawg, but they got shitloads of it, a lady from Monterrey, bro, I've been knowing her for years already, and, her husband or it's not her husband, her boyfriend, I did time with him bro, I did like four years with him back in the day, and then we ran into each other this last time I did time, and then he, they gave him a fifteen piece this time and she stayed working and she's been calling me and calling me bro, and she just called me last week she goes, Come over here. . ."
(Later during the call)
**GARCIA**: "But is it the same one? The Two or what?"
**HERNANDEZ**: "Naw, naw, she has big bundles bro"
(Later during the call)
**HERNANDEZ**: "Well that other dude call. . .he text me today looking for your number"
**GARCIA**: "Who?"
**HERNANDEZ**: "That one that told, the one I introduce you to him a while back, well you know him. . . Johnny"
**GARCIA**: "Huh?"
**HERNANDEZ**: "Johnny"
**GARCIA**: "What Johnny?"
**HERNANDEZ**: "Romo"
**GARCIA**: "Oh, all right, all right"
**HERNANDEZ**: "I got a text from him earlier this morning and he was. . he send me a text, Hey send me so and so's number. . ."
**GARCIA**: "All right, all right, no I mean, okay, not him but there is some other ones that are in, you what he is into"

**HERNANDEZ:** "Yeah"

A short time later, the call was terminated. During this call, **GARCIA** is telling **HERNANDEZ** that he contacted his drug customer and asked if **HERNANDEZ** received his electronic communication. Later during the call, **HERNANDEZ** tells **GARCIA** that he has a source of supply in Monterrey, Mexico for "Fire" (common code for high-quality marijuana) and that the price for the marijuana is "three and a half" ($350 per pound) and that she wants "C-O-D" (code for payment in advance for the narcotics). **GARCIA** then asks if they come in "the two" (code for bricks of two), and **HERNANDEZ** responds that she has "big bundles" (code for large bundles of marijuana). Later during the conversation, **HERNANDEZ** tells **GARCIA** that he received an electronic communications from **TARGET INTERCEPTEE Johnny ROMO** regarding contacting **GARCIA** about the drug debt. At that time, **GARCIA** tells **HERNANDEZ** that **Johnny ROMO** has "other ones" (code referring to kilograms of cocaine" that **Johnny ROMO** is "into".

**Intercepted Electronic Communication Conversation #4**
On August 3rd 2012, at approximately 6:31pm, **HERNANDEZ** (utilizing the **Prior HERNANDEZ Telephone**), places an outgoing electronic communication to the **GARCIA Telephone**:

**HERNANDEZ:** "Look bro, lets make it very simple cause tire of back in forth bull already. ..he or u don't have money by next week. . .I will collect some collateral. . .simple as that. . .By the good way or the bad way. . .However Im getting paid for by next week"
**GARCIA:** "Chill out my nigg its not as if it's a hundred stacks. Its going to get fix trust me"

During this electronic communication, **HERNANDEZ** threatens **GARCIA** to pay the drug debt or he will collect some collateral. **GARCIA** then responds that "its not as if its a hundred stacks" (code referring to a hundred thousand dollars).

√

## 2012 Intercepted Calls with Johnny ROMO

### Intercepted call #1

On July 16th 2012, at approximately 10:59am, **GARCIA** (utilizing the **GARCIA**

**Telephone**), places an outgoing call to **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

**GARCIA**:  "...I'll take it all day or if, you get the, you know the whatever you get on the green...This dude doesn't wanna start again, something small, just so I could...so we could start turning In, Bro? Like, like this dude has paper right now, for a hundred, a hundred and fifty a bow..."

**ROMO**: "How much?"

**GARCIA**:  "For a hundred, a hundred and fifty on the bows...You know what I mean?  That right there, bro...I mean, as we go, I'll turn in everything.  I don't give a fuck bro.  It's just that I don't wanna lose this dude.  You know what I mean?  He's ready.......I easily can pop a hundred, a hundred and fifty COD, COD with this dude."

**ROMO**: "Well...he can't do two hundred?"

**GARCIA**:  "I'm pretty sure, I mean I didn't tell him."

**ROMO**: "Well, find out bro....Then I'll talk to my guy.   If my guy sticks two hundred, he knows it's a bigger profit to him over here."

(Later during the call)

**ROMO**:   "We went to go pick up all those cars, dude. We rounded them all up.  We made Perko drive the truck cause that one had all the toys in the back seat wrapped up in blankets and shit...some ARs, AKs, and some little, little, machine guns, bro.....But he went for thirty grand, including the toys..."

(Later during the call)

**ROMO**: "Yeah well, we're talking about...but right now, we're talking about the green one.   I'm now talking about the white right now, bro.   I don't know when that shit gonna happen"

**GARCIA**: "No, No, No, They just want the green..."

(Later during the call)

**ROMO**: ...Yeah, dude, they were fucking being nosey, dude, Saw the guns.   Out of the eight dudes...It was all guns back there, they saw guns back there, in the blanket wrapped up...all of them"....K-OZ, Bandito, K-OZ and somebody else dude, were like "what the fuck?"

(Later during the call)

**ROMO**: "You know what I do on the side K-OZ, but there's nobody, god dude, but god damn, that's pretty heavy shit with all the, there's some little fucking heavy artillery in the back seat"

A short time later, the call was terminated.   During this call, the cooperating defendant

confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a current

drug debt as well as a possible future drug deal involving over one hundred (100) pounds of marijuana.    The cooperating defendant related that "green" is code for marijuana, and that "toys" is code for guns.    **ROMO** goes on to explain on how he paid his current drug debt with cars taken as payment as well as through providing firearms as payment for the drug debt.

**Intercepted call #2**

On July 25th 2012, at approximately 6:46pm, **GARCIA** (utilizing the **GARCIA Telephone**), receives an incoming call from, **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

**ROMO**: "…Listen to me bro, real good, He's not taking nothing, dude, Nothing but cash only, bro, he is going to pay for the driver, he's already gone.   He is going down there to talk about the white….He partnered up with somebody in Corpus Christi for the white but the green is ready to rock and roll.   He just needs fifteen cash…."
**GARCIA**: "All right"
**ROMO**: "…..Be ready for the green, but I need fifteen for the driver cause I have money to pay the driver..Cause I invested into the green and the white but right now I've got to go…"


A short time later, the call was terminated.   During this call, the cooperating defendant confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a proposed drug transaction involving several hundred pounds of marijuana.   The cooperating defendant related that "green" is code for marijuana, and that "white" is code for cocaine.   **ROMO** goes on to instruct GARCIA to pay him "fifteen" (code for 15,000 dollars) in order for marijuana to be delivered to him.

**Intercepted Electronic Communication #1**

On July 25th 2012, at approximately 11:37pm, **GARCIA** (utilizing the **GARCIA Telephone**), receives an incoming text message from, **ROMO** on **ROMO's cellular telephone**:

**ROMO**: "If you don't get the fifteen its not going to happen period, he's going to make us pay for

17

everything and then he's going to put pressure on me he's only wants fifteen can't let him down as it is you owe a lot I'm still waiting on ur call and their waiting on ur call"

During this text message, the cooperating defendant confirmed that the sender was **Johnny ROMO**, and that the conversation involved a proposed drug transaction involving several hundred pounds of marijuana.   The cooperating defendant related that **ROMO** told GARCIA to provide fifteen thousand dollars up front for several hundred pounds of marijuana, or **ROMO**'s source of supply was going to require GARCIA to start paying on their drug debt right away.

**Intercepted call #3**

On July 26th 2012, at approximately 6:50pm, **GARCIA** (utilizing the **GARCIA Telephone**), places an outgoing call to **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

GARCIA: "…Homeboy score but he is already getting his paper back.   He just scored last night and he is already getting his paper back.   The only thing is, he goes, Hey, I got 10 on me.   He says, I've got 10, I'll try to borrow five from my little homie"
ROMO: "Go get it, go get the, just go get it bro, and I'll meet up with you right now, just go get it, we got, we can't,…..wasting time"
GARCIA: "No, that's why I'm saying, I'm just telling you what he told me cause if not, if 10 is all right for right now, you know what I mean?"
ROMO: "Yeah…Let's just get it bro, hey, if I make enough to throw something…What if about he says, that's it.   That took care of the drivers.   We will talk about it when I get back"
GARCIA: "Okay."

A short time later, the call was terminated.   During this call, the cooperating defendant confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a proposed drug transaction involving several hundred pounds of marijuana.   The cooperating defendant related that "ten" is code for ten thousand dollars.   **ROMO** goes on to instruct GARCIA to go get the money and meet up with him when he gets it.   The cooperating defendant confirms that GARCIA met with **ROMO** provided the ten thousand dollars of drug payment to **ROMO** later that evening.

**Intercepted call #4**

On July 30th 2012, at approximately 1:34pm, **GARCIA** (utilizing the **GARCIA Telephone**), places an outgoing call to **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

**ROMO**: "This dude is off our back…all we are waiting for is work to start paying him off…But he is off our back..all he wanted is the fifteen and that's it…"
**GARCIA**: "And he said nobody does that, but I know you dog, and you are good, and he said, man you got a lot of shady motherfuckers…."
**ROMO**: "We owe like almost fucking three hundred and seventy thousand dollars, put it that way dude, and this ain't shit, ten thousand, you gonna get work, cause are gonna get work bro"

A short time later, the call was terminated.  During this call, the cooperating defendant confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a proposed drug transaction involving several hundred pounds of marijuana.  The cooperating defendant related that "ten" is code for ten thousand dollars.  **ROMO** goes on to tell GARCIA that he and **ROMO** owe their source of supply almost three hundred and seventy thousand dollars, which the cooperating defendant confirmed that he owed **ROMO** at least two hundred and fifty thousand dollars of that for prior drug transactions that **ROMO** provided to GARCIA.

**Intercepted call #5**

On July 31st, 2012, at approximately 11:27am, **GARCIA** (utilizing the **GARCIA Telephone**), receives an incoming call from **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

**ROMO**: "No later than Wednesday for me to be ready on the bricks, the green, he said, Thursday …"
(Later during the call)

**ROMO**: "He said there are going to be two kinds, the one I always get, and the popcorn, the popcorn is going to be like 750 bucks, here in town, up north that's what they ask for a lot when he takes about two thousand here, three thousand here, they ask for the popcorn, so he sells for 1100 to 1200 bucks up there….He said there are two kinds coming in, the popcorn and the regular…"
**GARCIA**: "The Regular is the Fluff"
(Later during the call)
**ROMO:** "Every time you had scored big during the holidays last year and this year, a big load comes with popcorn, but I never gave it to you cause all that goes up north cause you can't move that here but that goes like hotcakes up north."
**GARCIA**: "So we're good for Thursday or Friday"

A short time later, the call was terminated.   During this call, the cooperating defendant confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a proposed drug transaction involving several hundred pounds of marijuana.   Your affiant knows that "popcorn" is code for high-quality marijuana, and "fluff" is code for regular-quality marijuana.   **ROMO** is confirming to GARCIA that the marijuana "green" will arrive on Thursday, and the cocaine "bricks" will arrive no later than Wednesday.   **ROMO** later confirms that every time that GARCIA "scored big" (received a load of marijuana) from **ROMO** during the holidays last year and during this year (which is corroborated by the cooperating defendant's statements), **ROMO** never provided the high-quality marijuana, only the lower-quality marijuana.

**Intercepted call #6**

On August 9th, 2012, at approximately 2:02pm, **GARCIA** (utilizing the **GARCIA Telephone**), places an outgoing call to **ROMO** on **ROMO's cellular telephone**:

(Later during the call)

**GARCIA**: "Let him know that I didn't hesitate to give the car…"
**ROMO**: "I don't want to push it bro cause we owe two hundred thousand compared to ten grand bro, Come on bro…..You're lucky you're not picked up, I'm lucky I'm not picked up, I'm lucky he's not taking everything away from me and taking all my tow trucks…This is more serious than ten thousand dollars…This is a big outfit carnal …"

A short time later, the call was terminated.  During this call, the cooperating defendant confirmed that the caller was indeed **Johnny ROMO**, and that the conversation involved a current GARCIA's current drug debt to **ROMO's** source of supply.  **ROMO** tells GARCIA that they owe two hundred thousand dollars (which is corroborated by the cooperating defendant's statement), and that they are lucky that they have not been killed (picked up) as a result of their debt.  **ROMO** goes on to explain that he's lucky that the source of supply has not taken all of **ROMO's** tow trucks as a result of the outstanding drug debt.

P.    As previously mentioned in the current affidavit, on October 17, 2013, a court order authorizing the interception of wire and electronic communications was signed by United States District Judge Xavier Rodriguez within the Western District of Texas.  The wire and electronic interceptions were initiated on October 21, 2013.  From this time until the end of the interceptions on December 18, 2013, the DEA intercepted numerous drug-related calls and electronic communications between **HERNANDEZ** and members of his organization.  On the intercepted calls and communications, **HERNANDEZ** is heard coordinating drug payments to his source of supply, as well as arranging for future deliveries of narcotics.

## 2013 Intercepted Calls with Hector HERNANDEZ

**Intercepted call #1**

On October 21st, 2013, at approximately 6:22pm, **HERNANDEZ** (utilizing the **HERNANDEZ Telephone**), receives an incoming call from Pedro Duarte AGUILAR:
(Later during the call)

V

AGUILAR: "What happens is that I needed, I needed that little paper …"

HERNANDEZ: "No, No, I have it there, I have it there for you.   I have had it there, its just that I ….But I'll go over there and see you in a little while"

A short time later, the call was terminated.   During this call, Agents believe that HERNANDEZ owes AGUILAR money for a drug debt (referred to in the call as "papers"), and they agree to meet later that day.   (Agents conducting surveillance later observed HERNANDEZ meet with AGUILAR at their prearranged meet location).

**Intercepted call #2**

On October 21st, 2013, at approximately 8:21pm, **HERNANDEZ** (utilizing the HERNANDEZ Telephone), places an outgoing call to Pedro Duarte AGUILAR:

(Later during the call)
AGUILAR: "…Tomorrow, you'll be here in town?"
HERNANDEZ: "No, I'm leaving tomorrow.
AGUILAR: "But when do you get back?"
HERNANDEZ: "Day after tomorrow, I don't know if I'm going to stay over there, I might just go and I'll take off over there early…."
AGUILAR: "Uhh, are you going to want to continue working or how do we do this?"
HERNANDEZ: "No yeah, fuck yeah!"
AGUILAR: "The problem is that it's too late right now to go and get that work from over there. If you want, tomorrow, tomorrow you, you'ld come back tomorrow afternoon, if you came back?"
HERNANDEZ: "Yes"
AGUILAR: "Well, if you want I'll give you the work tomorrow, no?"
HERNANDEZ: "That's fine"
AGUILAR: "Once you, when you're ready call me and we'll meet somewhere, I'll meet you"
HERNANDEZ: "Okay…But I want to take you that, take you this right now…."

A short time later, the call was terminated.   During this call, Agents believe that AGUILAR asked if **HERNANDEZ** is going to want additional narcotics (referred to in the call as "work"), which **HERNANDEZ** agrees to receive from AGUILAR the next day.

**Intercepted call #3**

22

On October 23rd, 2013, at approximately 12:17pm, **HERNANDEZ** (utilizing the **HERNANDEZ** Telephone), receives an incoming call from Raul PUENTE:

**HERNANDEZ**: "Hello?"
**PUENTE**: "You hear that bullshit?   You heard it?"
**HERNANDEZ**: "Yes, what is that shit? Only when I call your phone"
**PUENTE**: "They're playing, they're playing, they're playing with our phones."
**HERNANDEZ**: "Wow, dude"
**PUENTE**: "Ah! What the fuck!"
**HERNANDEZ**: "Fuck!"
**PUENTE**: "Too obvious, too obvious"
**HERNANDEZ**: "Yeah, for real"
**PUENTE**: "They might as well just jump on the phone and start conversating with us too, they might as fucking well, shit"

A short time later, the call was terminated.   During this call, Agents believe that Puente is telling **HERNANDEZ** that the government is currently listening to their phones.

**Intercepted call #4**

On October 24th, 2013, at approximately 10:54am, **HERNANDEZ** (utilizing the **HERNANDEZ** Telephone), places an outgoing call to Christina RAMIREZ:

**RAMIREZ**: "Hello?"
**HERNANDEZ**: "Babe"
**RAMIREZ**: "Yeah?"
**HERNANDEZ**: "Go to that liquor cabinet, that bag, that Wal-Mart bag"
**RAMIREZ**: "Okay"
**HERNANDEZ**: "Break it all up into little pieces and flush it all right now.   Now!"
**RAMIREZ**: "Okay, all right"
**HERNANDEZ**: "Bye"
**RAMIREZ**: "Bye"

A short time later, the call was terminated.   During this call, Agents believe that **HERNANDEZ** is telling his live-in girlfriend who is currently at their residence, RAMIREZ, to flush the narcotics that they store in their liquor cabinet.   Immediately prior to and subsequent to this calls, Agents intercepted several calls where **HERNANDEZ** has identified Agents conducting

surveillance within the area of his residence.    Agents believe that as a result, **HERNANDEZ**

thinks his house is about to be raided by law enforcement and he is asking RAMIREZ to flush the

narcotics at his residence. (Agents conducting surveillance at HERNANDEZ' residence during

that time observed RAMIREZ at HERNANDEZ' residence.)

### Intercepted call #5

On December 2nd, 2013, at approximately 3:22pm, **HERNANDEZ** (utilizing the

**HERNANDEZ Telephone**), places an outgoing call to Pedro Duarte AGUILAR:

(Later during the call)
AGUILAR: "…How are we doing with the papers?"
HERNANDEZ: "Primo, where are you? I want to talk to you in person right now.
AGUILAR: "I can't right now, Hector.   I'm busy, It would have to be later because I'm busy right now."
HERNANDEZ: "Okay, so I will call you later."
AGUILAR: "But what time would it be?   Because I have things to do and I have to go out too."
HERNANDEZ: "I'm the same way, Primo, but I have time right now, that's why I'm calling you so I can meet you right now."
AGUILAR: "Okay, where, where, where are you right now?   Because I can send someone right now there that is close to where you are located."
HERNANDEZ: "No, No, I want to talk to you in person"
AGUILAR: "But the problem is that how things are going to be are clear.   I just want my papers and…or the work, one of the two."
HERNANDEZ: "That's fine, that's fine, Primo, but I want to talk to you in person, Primo."
AGUILAR: "Well, that's why I'm' telling you, if you are not going to take work or papers, I don't see the point.   I need, I need, because they already got mad at me because I owe…And I need to know about the papers or the work, uh, if you are going to take me something that should be it."
HERNANDEZ: "Primo, I'm not going to repeat it again, don't be calling me on the phone just like that, Primo.   I'm telling you that I want to meet you in person, what I'm telling you, it's not a game, I don't play games, I'm not the type of guy that wants to screw people over, or burn them, I'm straight."
AGUILAR: "Me too."
HERNANDEZ: "This job, this job what is happening is a serious thing, I'm telling you, I want to talk in person with you, so I can tell you what is happening and you're calling on the phone, I don't like that stuff Primo.   You were the one that that told me that…
AGUILAR: "…You don't like it"
HERNANDEZ: "You were the one that told me that, you have many years in this and you should know that you should not be calling."
AGUILAR: That's one thing.   Things can be work out, things can be work out one way or

another and what is happening is that you tell me one thing and you don't do it.   Then I don't, I don't…"

HERNANDEZ: "If you know, if you know, and what little I have told you, you know why, Primo."

(Later during the call)

AGUILAR: "I'm not saying anything bad over the phone. I'm not saying anything bad over the phone, I'm just telling you that I want the papers for the car or, or if not, or if you haven't done any work, that you should return the papers for the car or the work, that's all, I'm not saying anything bad, and besides…"

HERNANDEZ: "The work, you, you, you want me to return the work?"

AGUILAR: "And I'm right since it's something that belongs to me."

(Later during the call)

HERNANDEZ: "I'm not playing with that, Primo. I don't play with those things, to me that is a serious thing."

AGUILAR: "I don't play either"

HERNANDEZ: "To me, you are threatening my life, you are threatening my family life.   I can do the same thing.   I can send people to look for you right now."

AGUILAR: "Let's see, send it."

(Later during the call)

AGUILAR: "You don't call me."

HERNANDEZ: "I've been telling you that this phone is no good."

AGUILAR: "Okay, but I'm not talking about anything bad, we're not talking about anything."

(Later during the call)

HERNANDEZ: "I don't want to answer you in this one, Primo.   Don't you understand?"

AGUILAR: "But there are other phones, you have another phone that you can call too."

HERNANDEZ: "You know Primo.   Once you have talked on a phone, that one has already been fucked and that is the way it is.   You know it."

A short time later, the call was terminated.   During this call, Agents believe that AGUILAR is telling **HERNANDEZ** that he either needs to pay his drug debt (referred to in the call as "papers"), or he needs to return the illegal narcotics (referred to in the call as "work", and according to Confidential Sources, is the crystal methamphetamine that **HERNANDEZ** receives from AGUILAR).   Later during the call, **HERNANDEZ** tells AGUILAR that he doesn't want to talk on his phone, and would rather meet in person, so that law enforcement would not detect it and attempt to listen.

25

Q.    Your affiant believes that the above documented intercepted wire and electronic communications demonstrate probable cause to believe that **Hector HERNANDEZ** utilized his cellular telephones to facilitate his drug trafficking activities while in the San Antonio area, and that **Johnny ROMO** also utilized his cellular telephones to facilitate his drug trafficking activities while in the San Antonio area.

## VI.    CONCLUSION

R.    Based on the above, there is probable cause to believe that the **Hector HERNANDEZ** and **Johnny ROMO** have conspired to import and distribute marijuana.

WHEREFORE, your deponent respectfully requests that warrants be issued for the arrests of **Hector HERNANDEZ** and **Johnny ROMO** so that they may be dealt with according to law.   Your deponent also requests that this affidavit and the arrest warrants for the defendants be sealed, except that the DEA may disclose this affidavit and the arrest warrants as necessary to effectuate the arrests and arraignment of the defendants.

CHAD LLOYD
Special Agent
Drug Enforcement Administration

Sworn to before me this
27th day of February, 2014

HENRY J. BEMPORAD
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF TEXAS